The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Be seated. Our final case of the day is W.S. v. Daniels. Ms. Stone, good to have you. May it please the Court. My name is Heather Stone. I'm from Abbeville, South Carolina. And this is my first time at the Court. I'm really excited and pleased to be here. Thank you. Your Honor, the sole issue before the Court today is the issue of set-off. And the lower court found that the damages in this case could not be allocated between the defendants in a fair and equitable manner. But then went on to find that because they could not be allocated fairly, that there should be no set-off. And respectfully, we would ask this Court to reverse that decision of the District Court and hold that the damages, since they cannot be allocated, that there should be no set-off at all. So help me understand why that is. I understand the idea that allocating can be hard, particularly in cases like this that are hard in their own right. But, you know, when we apply the law of a state, we don't have an exception for we don't do it when it's hard. Right. When we just do our level best to apply. So help me understand your argument that because it's hard, we ought not to do it. I don't I don't see that as I mean, you have other arguments. Right. But you led with this one. So let me let me understand it a little bit. I get it's hard. It's not subject to mathematical precision. I get that, too. Right. But that doesn't mean that we don't do it. Right. So help me understand your argument that because it's hard, we shouldn't do it at all. Well, in our briefs, we argue that the record was replete with plenty of information. Should the court want to try to parcel that out? I get that it's very difficult to say that, you know, we went to trial on four sexual assaults and the settlement with Boys Home covered a much broader, much broader set of facts and a lot of more information that was never presented in court. So I get that it's difficult to parcel that out. It's difficult to say that one sexual assault caused PTSD or depression or anxiety or suicidal ideation versus the other dozens of sexual assaults that happened to our client when he was in foster care. So I get that it's difficult, but we took the position that if the court had wanted to do that, they could have. And the defendants never proposed a way for the court to do it. And that's their burden under the existing case law, that it was the defendant's burden to show how the damages should be set off. And so since they didn't do that and since the court found that it was too difficult, we believe that ergo the damages should not be set off at all, if that makes sense. It provides a windfall to them to give them credit for the entire amount when the jury only heard a very snapshot of what we really had as far as evidence of all the different sexual assaults that our client went through. Do you agree if for a minute we're actually doing the hard job of allocating the settlement amount? Do you agree that we do so at the time of the settlement agreement? It's not we don't get the benefit of hindsight, right? You've talked about the jury and these other 17 sets of incidents. But the South Carolina court tells us we've got to do it as of January of 2017, right? We've got to sort of put blunders on what happened in the future and evaluate what the defendant would have allocated at that time. Do you agree with that? Yes, sir. We mediated the case in December of 2016 just with Boys Home of the South. And just to give you an idea of kind of the backdrop of that, there had been some litigation in some companion cases before. So we had the benefit of kind of having an idea that a lot might come out in discovery about. We knew that one third of the boys, for example, at this particular Boys Home were sexually active with each other. And we knew that the administration, the staff, that they were aware of that. So at the time, we knew that a lot would probably come out in discovery. And I think the defendants knew that, too. And so that's why they were willing to settle. So you when you say that, I think that's sort of an interesting point. And you raised that in the I think it's section four of your background piece. When you say they knew or should have known that lots more was going to come out. But all the evidence that you point to in that section, at least if I'm missing, are things that happened after the settlement. Right. You say January 17th is the settlement. You're like on January 31. We serve these discovery notices on February 7th. We'd serve these discovery notices. We had this fight with the judge about a motion to compel or whatever it is. All of that happened after the settlement. Right. But what I don't see in your account is any support for the idea that they knew that before the settlement on January 17th. I understand you asserted it. And I totally understand that, you know, and I am not meaning to impugn you at all. But I got to rely on a record. Right. Not your like perception, as you recall it back in December of 17, absent an affidavit from you. Then you're not a lawyer. I guess not. But help me understand how I'm supposed to know that the defendants anticipated something that I don't see in the record. Well, it's true. We did not have access to a lot of the files. But what we did have access to was our client's file. And so we knew just from that that there was evidence that they knew about the sexual assaults and it had gone on. What we didn't have access to were the other children's files because to get that we had to get that in discovery. But just based on our client's file, we knew that there were going to be, you know, a lot of evidence that was going to be coming out in discovery. And Boys Home had had the foresight to decide to settle the case because they knew that if they did not, all this was going to come out. And then we would amend our complaint and add more causes of action against them, new defendants and that sort of thing. So I'm not sure we ought to be considering things that happen in the future, but you keep coming back to it. Right. But if all that was like so obvious and the defendants would have been totally aware of this, it seems odd. It took like 18 months for you to amend your complaint at a time when the case had been pending for two and a half years. The court then denies the motion to amend as being untimely and prejudicial to the defendants. Right. So, I mean, if I'm just looking at it as a record, I understand with hindsight, you want to say it was obvious that we were going to amend and add this stuff in January of 17. But then, you know, we don't actually do that. Right. I mean, like. Show me something that suggests that that's true. Right. And your actions in waiting until 2018 to amend don't suggest that. Right. I mean, that's what I'm having a hard time understanding. Well, we couldn't get we couldn't amend until we had the records. And if you look, if you actually look at the file, you'll see. And why? And why is that? Help me understand why. Maybe I don't understand these cases well enough and then I will stop talking because my colleagues haven't. But why? Why? Why is it? I mean, your your client obviously knows what occurred. Right. And so what are the records providing you that your client doesn't already have knowledge of? Well, our client said that he was raped by these individuals. Right. But to bring a successful 1983 case, we really need to show that DSS was in these individual defendants. And we're on notice of the danger to our client of this other child, because this is a level one group home. So all the children, they had no awake supervision at night. So we wanted to show that they had noticed that this child was a danger. And I'll just give you an example. One of the children, when in discovery, we got his file. We found a letter from when you say one of the children. I'm sorry to be precise here, but you mean one of the attackers? Yes. Right. So that. Yes. Not the victim, but that's correct. And that child had a document in his file from a therapist that said this child should not be around other children. He is sexual, you know, has these sexual tendencies and and acting out and should not be around other children at all. And yet they left him in that group home with no overnight supervision with my client. And then my client says he was sexually assaulted. So we really needed the records to be able to file for the motion to amend. And your honor, respectfully, we did. We found motions to compel that sort of thing with the court. We. But you got to understand the defendants for having to produce thousands of pages. They kept needing more time. The court gave them more time and we didn't have an issue with that. But while it looks like it was a long period of time, it really wasn't because it just took them that long to produce the records for us to agree on what they what they should produce. Because under the confidentiality statute in South Carolina, they have those records are confidential. So we had to show very precise need for it and what things we were looking for out of the file. Like they didn't give us the whole file for each child for us to go through. It was narrowly tailored and the defense attorneys had to go through it page by page and pick out the stuff that the court said we were entitled to. So I don't want to look like we were neglectful in bringing our complaint. I wasn't trying to suggest you were. I'm just trying to understand. Yes, sir. But that's why that's why it took so long to bring you back to this appeal. What's our standard of review? Well, I thought it was clear air. But looking at the last time it was in front of the court, it sounded like you thought it was the Nova. So we'll just go. That's what if that's what your honor. I don't want to I don't want to incorrectly state the record. So if it's clear air, that'd be clearly erroneous. Judge Coggins ruling would have to be clearly erroneous for you to prevail in this second appeal. That's true, your honor. But we do believe that it is clearly erroneous. Whether it is the standard DeNovo or clearly erroneous, we believe that it meets either one of those standards. And so such things as in his opinion, he wrote this memorandum of opinion or memorandum order, whatever you call it. The court finds that the agreement clearly states that it covers the claims raised in the complaint. The settlement with DHOTS encompassed the same injury for which plaintiff recovered against SCDSS. To find otherwise would allow a double recovery. Thus, the court finds that the settlement involved compensation for the same injury contemplated by the jury award. Therefore, set off in the total amount awarded by the jury is appropriate in this case. So that's what you have to want us to say. You have to get us to say those statements by Judge Coggins are clearly erroneous. Yes, your honor. That's your argument today. Yes, your honor. Those statements are in direct contradiction to what your instructions were. Well, if we disagree with that, we said we'd unsettle this thing. You did say that. I think my name is on the back side. Yes, sir, it is. I didn't notice that. The way I understood your instructions, your honor. So we left it to Judge Coggins. Right. In the final analysis. Well, I understand that, your honor. But I also understood that your instructions were that the settlements were different. The settlement with Boys Home covered the entire three-year period. The verdict with DSS only covered what actually was tried. And so you remanded it based on the Smith factors to Judge Coggins. And the defendant had no suggestions on how the court should allocate it. So the court just said we can't allocate it. And we think when that's the finding, there is no set off. If that's his conclusion, he found the opposite way the whole thing was set off. But we think that based on the case law, like the Vercevo case and the Smith case, and other cases in South Carolina, that there should be no set off at all. So can I ask what you do? I understand your argument is that Judge King's prior opinion sort of resolved this question and showed that Judge Coggins got it wrong in this part. What do you do with the next to the last sentence of our prior decision that says we express no opinion on how set off issues should be decided and leave it to the district court? I mean, how do you understand that sentence? Because it seems like to me, I'm with you. There are parts of the previous opinion that you could read one way or the other. But it seems like to me that last sentence sort of makes clear that we're not telling the district court what to do. We're just telling him to do it. Right. And so my understanding is that on the remand, there could have been findings of fact made, new evidence presented. The defendant could have presented new evidence. We could have had evidence presented. But that didn't happen, and the court just said the same thing. I can't deal with this because it's so complicated and interwoven with the damages and the different factors. So his finding was damages cannot be allocated. So our conclusion is if that's the finding, then the next result is there should be no sale. I know I'm out of time, Your Honor. Thank you. Thank you very much. You saved some time. Mr. Lindeman? Good to have you with us, Mr. Lindeman. Thank you, Your Honor. May it please the court, Andrew Lindeman for the appellee, the South Carolina Department of Social Services. Let me start with the question that Judge King had raised. I believe the standard review here, which obviously is a significant starting point, is the clear error rule. And as I interpret the briefs, there was no controversy about that. In fact, in the standard review section of the appellant's brief, they also cited the exact same case I did, the Atlas Food Systems case from this court from 1996, indicating that issues dealing with setoff, the court applies a clear error rule. And, of course, that's significant because that's a very deferential standard review, as this court well knows. And I would submit neither in their briefing nor in their argument to the court today that the appellants have shown any clear error by Judge Coggins. In addressing the merits, let me start with this point. I don't read Judge Coggins' order as refusing to allocate or saying it's too difficult to allocate. He does address the issue, which is separate and apart, of allocating between the three occurrences, but he does not find that it is too difficult to allocate between the claims against DSS vis-à-vis the claims against Boys Home of the South. And, in fact, ultimately… Let me understand that, right? Sure. I understand there's some ambiguity about that, but with respect to the two sets of claims in January of 17, I understand what he was required to do by order and, indeed, by the South Carolina law was to take the settlement amount from January of 2017 and determine how much of it was allocated to the four claims that were in the complaint that were brought, that were being litigated, and how much of it was allocated to the sort of catch-all, which is in anything else that might come up. Right? And so these are two buckets, and we can imagine lots of different ways to allocate those. You know, you've been a defense lawyer for a long time. Like, the tail end has some value. It's not zero, right? And particularly in these contexts, we know it's not worth zero, but the court has to assign some value to the future claims as opposed to the claims that are existing. And so what if I read Judge Coggins' order and said, he says the tail end of this is worth zero, right? The future claims, the claims are not yet brought, right? They could have been brought or might be brought is worth 0%, and the four claims is worth 100%. What if I just said, like, as a matter of, like, basic economics, like, that can't possibly be true, right? The tail end has to have some value. Maybe it's only worth 2% of the settlement amount. Maybe it's 10% of the settlement amount. But it can't be zero. What if I said that was the clear error? Well, and I don't believe that that was Judge Coggins' ruling. I mean, obviously, the settlement. He says it's 100%, right? It's 100% overlap. Oh, he does not ever say that because bottom line is, he has a $425,000 gap that he doesn't have to address. He could have done that, but let me just pause it for a minute, and accept hypothetically that I read him as saying it's 100%. If he said that, he didn't use the words, but if I interpreted him as saying that, do you agree that would be clear error? I do not, and I'll tell you why, but I definitely don't think he went that far. I understand. And the reason for that is under the Smith v. Widener case, and South Carolina jurisprudence on this, as this court directed the judge to go back and hold a hearing and do, you look at whether or not it's the same injury. And everybody's trying to focus on the same claims, but it's the same injury. And I think part of the disconnect here that Judge Coggins picked up on and recognized and is addressed in his order is when we went back and we looked at how the case was tried, and unfortunately because we were focused on so many other different issues, the actual testimony of W.S. and his damages witness, the psychologist Laura Mason, were not actually in the joint appendix the first time around. But ultimately when you look at W.S.'s testimony, the plaintiffs were not limited to four incidents in the way they tried this case. And I think if you look at the complaints, the complaints that went to trial are not limited to four incidents. I think part of that misnomer is because when the jury was asked to identify occurrences, they only identified three. But if you look at the way the case was tried and the damages that were presented to the jury, it was the totality of it. I understand that. So what was the damages testimony? Is that in our current JA? It is. It is. And, yeah, I would encourage. So how did he calculate the damage? How did he propose the jury to calculate the damages? Well, there were no limitations in the charge placed on the calculation of damages. How did the expert propose or address damages? You say that that gives us the insight as to being the same injury. Laura Mason, she testified to the collective damage just like W.S. did. And basically the diagnosis was PTSD with clusters of anxiety, as she indicated. She was only asked questions regarding what the total effect of all of these incidents of abuse were on W.S. All of the damages evidenced in the case, and that's why this is critical, is all global. It's all collective for the entire three years the plaintiff spent at Boyd's Home of the South. I would encourage the court, and we did attach it to our memorandum after remand, those two portions of the testimony. And they're both in volume six of the joint appendix. I know it's a very wieldy joint appendix, but if you focus on the volume six, it's all there. W.S.'s testimony in total starts at page 3552 of the joint appendix. And what I'd like to point out to the court, and this is also in our brief, starting at 3565, he was asked this question. It was by his own counsel and how they deliberately presented the case, which was as a global case involving the entire three years. Page 3565, and quite honestly, these were a lot of leading questions by their counsel. As we point out in our brief, this isn't something that was inadvertently blurted out by a witness. Most of these are leading questions. So the question was, you were there about three years. Were you sexually abused while you were living at the Boyd's Home of the South? Yes, ma'am. Next question. How many times would you say as a rough estimate that you were sexually abused there at Boyd's Home? More than a hundred. So the testimony and the way the case was presented to the jury was not limited in any respect to four instances of abuse. He testified to more than a hundred. Then if you follow for the next 15 pages, Miss Stone, who was questioning W.S., took him through all of these different episodes and not just with the abusers who were involved in those four incidents, but numerous ones. In fact, the very next question on page 3566 of the joint appendix, how many different boys would you say abused you there? Answer, I don't, I can't remember. Would it have been at least 12? Yes, that sounds correct. Possibly 15 or somewhere in that number. Yeah, someone in there. And then Miss Stone takes him through all of these different assailants, actually specific questions regarding specific incidents involving 10 different assailants, all by initials. And then at the close of that section of the W.S.'s testimony, she closes, and this is on page 3578, question, is that the bulk of the sexual abuse that you endured at Boy's Home? Yes, ma'am. And again, if you added all of these together, all of these incidents together, you said it would be more than a hundred times that you were sexually abused there. Yes, ma'am. So again, applying the proper test under South Carolina law, this court recognized in the first appeal, which is expressed in the Smith v. Widener case, you look at whether or not it's the same injury. I mean, typically where allocation comes into play that we don't have in this particular case, allocation among claims is typically where you have a wrongful death and survival, or wrongful death or a survival claim and a loss of consortium claim, where you have very distinct plaintiffs and there's allocation. The majority of our cases, particularly in the last 10, 15 years, and I've actually handled a couple of them, that's the issue, the Green v. Byerly case that was cited by Appell in this case I'm still involved in. And that was a case where you had a automobile accident and it was an allocation between husband and wife on the injured party's tort claim versus the loss of consortium claim. We don't have that here. And so if you specifically apply the same injury test, and this is how we ended up arguing with Judge Coggins, and he accepted this argument, I think that's clear from his opinion, is that it's the same injury. And it wasn't limited. What's critical, absolutely, in looking at it, it was not limited as far as the presentation of the evidence to the jury, it was not limited to four events. It was not limited to four abusers. The evidence clearly went to the jury on the entire three years at Boy's Home of the South, and that encompasses the entire injuries that Boy's Home of the South paid $825,000 for. And again, what's critical here, too, is, and I guess I'm not going to quibble with Judge Richardson, you reading the order as suggesting that we get a full $825,000 set-off. We don't need an $825,000 set-off. I totally get you don't need it. Right. And we made that point, if you read the transcript of the hearing after remand, make that point. We don't even need 50%. We need just slightly less than 50%. And Judge Coggins agreed with us. He didn't need to parse it out once he determined that $400,000, clearly there's an overlap because of the way the case got tried. And I would also point out to you, you know, the plaintiffs are trying to walk this back because obviously it hurts them greatly on their set-off argument. But the bottom line is they deliberately tried the case the way they tried it, which is all three years. And again, I can't overstate this. If there's any part of this ridiculously large record that the court focuses on, I would suggest it would be the testimony of W.S. and particularly those 15 pages because Ms. Stone, when she was questioning him, led him through all these multiple incidents. There was no attempt whatsoever to highlight four incidents or try to obtain testimony that would suggest that there were specific injuries to those four incidents. And, of course, that's key as well because the entire damages claim was presented to the jury as a global damages claim. There was no attempt either by W.S. or by the therapist to try to pinpoint specific damage to a specific incident. And, of course, that makes sense because in a case like this, the various acts of abuse multiply on top of each other, but it's still going to cause the same PTSD, the same anxiety, the same need for any type of future medical that Ms. Mason testified to. So, again, what Judge Coggins focused on in his order is what he calls the cumulative injuries. And he indicated in his footnote three that both sides addressed the fact during the hearing that the evidence was cumulative or global as to the injuries. And that's what makes it a perfect candidate for a set up. And to the extent that there is any reasonable argument to be made that there's claims that were settled with the Boys Home of the South that were not tried, I don't know what those were because obviously the complaints were identical. But assuming that there were different claims that could have been brought against Boys Home of the South, there's $425,000 above the set off amount that compensates for that. And maybe Judge Coggins could have been a little bit more careful with his language, but I don't believe his intent here, quite frankly, was to award a set off of the full $825,000. So just to make sure I understand your argument. Had they, so I understand the four incidents that were in the complaint don't involve like four specific assaults, but they involve four sets of assaults. Is that a fair? I'm not sure. I mean, I didn't try the case, but I'm not. Bear with me. Assume that's true for a minute.  The result in your view would have been different if at trial their damages theory had been you should award $100,000 or $500,000 for every sexual assault. Because it is the assault itself that is the injury that is being compensated. And so their damages theory that they put before the jury was each of these four deserves half a million dollars in compensation. In that scenario, it would look different. Is that a fair? Because that would be categorizing sort of injury with respect to specific assault, which would be totally reasonable way of thinking about it. Or you could do it as a collective. And I understand both of those are approaches. But do you agree that if they had done it half a million per assault, that that would have required a different allocation or at least a different sort of discussion about allocation than what we have here? Certainly, if that was if that was the approach at trial and the way the case was tried, I think we would be looking at a different analysis. And I believe Judge Coggins recognized that that's not the way the case was ultimately tried. So he didn't have to go there. But yes, if they said incident A caused him $50,000 of damage and incident B caused $90,000 of damage and of course had evidence to back it up, medical bills, you know, whatever. Certainly we'd be in a different position. Even if they said there's a collective harm, right, so maybe there's a half a million dollars in collective medical bills, but you ought to impose $100,000 per assault because I physically went through this sexual assault. In that scenario, it would just require a different analysis. Might have ended up in a similar place or might not have, but it would require Judge Coggins to take a different approach. Yeah, and quite frankly, if the case was tried where it was limited to four different assaults. And I don't even read the complaint as limiting it to four different assaults, quite frankly. But it doesn't matter really what the pleadings say at this point. What matters is how the case was tried. And I would also point out that if you look at the judge's charge on damages, he didn't limit the jury and he didn't give them any type of instruction to say there are four incidents that are before you. You have to determine damages on those particular four. No, he gave a very broad damages charge that said you need to award him any and all damages that are due. And obviously, I believe that the jury's award against DSS of $400,000 was for the entire three years that he was at Du Bois Home of the South. And certainly that's the way, as I indicated, the case was tried. I mean, what's fatal to the plaintiff's argument here is they, in essence, hate using cliches, but they can't have their cake and eat it, too. They were allowed to try their full case, every single claim that they wanted to, every single assailant that they wanted to during that trial. And that's clear from that direct examination of WS. And that's also clear from how Ms. Mason testified globally as to his psychiatric condition and ultimately the therapy and his future prognosis. Can I ask a record question? Sure. It is big. Are the closing arguments included in the JA? Good question. I don't believe so. You know, were they transcribed? Are they included on the record? I feel confident that they were. And I'll be honest with you, I did not look at those. So they could be in there. I don't think they are, though. But ultimately, that would be available to you because I do believe the whole transcript was transcribed. So, again, to sum up, I see my time is running out. This is not a case. And quite frankly, without— Hold on just a second. Before you sum up, they'll give you a chance. But you were closing out with the, you think it covered the entire time, the 2008 to 2011 timeframe. If I should read it a little differently and feel like the trial encompasses March 2009 to 2011, because that's when the gross negligence issue arose with respect to DSS, does that change the result from what you just described? I don't think it does. The very first part of the testimony after WS testified that there were over 100 issues or cases of abuse, I believe they start with the very first one involving an inmate or, I'm sorry, an abuser named DS. And they don't identify the date, but it's a— And you said that shortly, that happened shortly after you arrived in May 2008. So, again, I think the testimony does cover the full three years. Well, it was one month short of three years that he was at Boyd's home of the South. But, so I don't know that I would agree with you that it can be read as limited. When was the earliest date of the gross negligence proved to try? The finding of the first occurrence was in March of 2009. And that was necessary for what in terms of proof it tried? That was—you know, and that's an interesting point because it's— our South Carolina Tort Claims Act has this torture definition of occurrence, which I actually argued in a case before the South Carolina Supreme Court two weeks ago, so hopefully we'll get some clarity about it. But the bottom line is, it's a liability issue. In the Boyder v. South Carolina Department of Transportation case, the South Carolina Supreme Court in 2011 indicated that you don't determine the number of occurrences based on the number of injuries. So the occurrence issue is simply, as Judge Coggins pointed out in the footnote, is simply a matter of determining how many caps of liability are available under the Tort Claims Act because we have individual caps of 300,000. Is that March of 2009 date? Is that the date upon which DSS first became liable within the meaning of liability? Forget about damages for a minute. I don't believe so because of the way the case ultimately got tried and the jury returned a general verdict. I mean, you could use past instances in different ways, right? I suppose I'm not certain exactly where you're going with that, but I assume so. The jury was asked on the verdict form, they were asked not about those specific three incidents. They were first asked two questions asking them, we, the jury, unanimously find as follows as the gross negligence claim, do you find by a greater way than the evidence that, one, the defendant, DSS, was grossly negligent in protecting plaintiff from harm, yes or no? I mean, it's not limited in time scope, and neither was the charge, as I indicated. The charge asked, directed the jury to return any and all damages that they believe. Okay. My question, gross negligence was necessary to establish liability. That's correct. It's a gross negligence claim. And if we say that March 9, 2009 is the earliest date upon which the jury could have found gross negligence, understanding there may be a lot of assaults that occurred prior to then, but that's the first date upon which DSS could be held liable for what occurred. Does that, if I should read that to say, DSS is now liable for everything from 2009 to 2011, does that change your argument in terms of the injury? It does not, because it's the same, it's going to be the same injuries. Again, all of the testimony was the collective global injury to WS, not only from him, but also his damages, damages witnessed. There was never an attempt, going back to Judge Richardson's example, there was never an attempt to apportion damage to any particular incident by the plaintiffs in the presentation of their case, or by the defendant in defending the case. So one way to interpret it would be to say the release covers 08 to 2011 and Boyd's home's liability with respect to the assaults that occurred throughout that time period. And if I say DSS's liability arises in March of 2009, that's when they were at least initially grossly negligent, it still doesn't change the analysis because regardless of the instances of assault, the injury is a result of the conduct that occurred over that entire time period. That's correct. Okay. And if I can take maybe 30 seconds to sum up.  You know, we haven't even touched on the issue that Judge Goggins looked at as well, regarding the specific language in the settlement agreement with Boyd's Home of the South, which talked about that the settlement was for claims that were brought in that particular lawsuit. There were two very specific recitals that state that, which is an additional argument over and above just the application of the same injury rule. But again, based on this court's remand instructions, and I do believe this court left it to Judge Coggins, quote, in the first instances this court indicated to determine these issues. I don't believe that the appellant has shown clear error. I think Judge Coggins did exactly what this court asked him to do and focused on the injuries that were presented at trial, comparing those to the injuries that Boyd's Home of the South paid their settlement for. We would ask the court to affirm. Thank you very much. Thank you, Your Honor. Ms. Stone? Ms. Stone? May it please the court? I think where a lot of the confusion is about, you know, in a lot of these cases, the sexual assaults are not reported right away. Children are reluctant to disclose what happened to them, and that's true in particular in this case. W.S., the ones that we went to trial on were ones that got reported. There was actual rectal bleeding, and that's why he had to get medical attention, and that one got reported. And so that was actually in our client's file, and there was, you know, the other incidents were actually in our client's file. The difference is that when our client named other people that had assaulted him other than those four times, where DSS becomes liable for that is if the child who assaulted our client was inappropriately placed at the Boyd's Home, because like I said earlier, the Boyd's Home is a level one facility. They do not require 24-hour awake supervision. So the kind of children that are placed there are supposed to be just quote-unquote, you know, typical foster children. They're not supposed to be children who have a history of sexual behaviors or sexual acting out. So I think what's critical for the court to understand is that we were… Why is it child-specific? Why couldn't you just say, like, they're not checking anybody that's coming in here, right? They're letting people in no matter what. And given these three examples of very bad actors that they put in, that's like grossly negligent as a general matter, right? Why do you think it has to be attacker-specific, right? Can they be grossly negligent in the manner that they're running the home without requiring gross negligence with respect to a particular person? That doesn't seem like the way we typically think of gross negligence. We tend to think of it as like the course of conduct that they're engaged in. Well, I think you've got to understand all these children are in DSS custody and they're all placed at the Boyd's Home in the South. And sometimes only DSS has full knowledge of the children's behavior. Maybe they might not have told Boyd's Home in the South everything, or maybe they did tell them and they accept them anyway and it wasn't an appropriate placement. But I think it's critical for the analysis of the case that the individual child who assaulted our child, that that person had a history of inappropriate behavior with either bullying or sexual assault. Because otherwise, how can you say that DSS was grossly negligent if they had no notice that this particular child would act out? Well, because they put five others in that were acting out, right? I mean, their procedures are grossly negligent. Can you address the argument that your colleague made, which is regardless of what constitutes gross negligence, that you presented the case as, the word he uses, a collective injury with global damages, right? Referring to, you know, 100 plus assaults by 12 to 15 different boys, and that you presented that as a collective global injury and not sort of a tax-specific? Sure. I think it would have been disingenuous to, you know, only focus on the ones in the complaint. And the judge did allow us to have our client testify, but for the same reasons the court said the damages are cumulative and cannot be reduced to a simple mathematical equation. But the important thing to remember is the jury charges that the judge specifically instructed the jury on, that they were not allowed to consider the sexual acts by the other children except for notice. So they were specifically not allowed to consider that in the jury charges, and that's why we stated in our brief that we felt like the defendants were attacking the legitimacy of the verdict. They helped craft the charges as well. That charge was because of the judge's ruling that we were not to get into all these files of the other children. He only let in a very select few children's records, a few documents even. Was the J site for the except for notice provision? Let's see. It looks like it's 3486 to 3492. Those are the jury charges. And that's what said the jury was limited in what they considered those other acts for. And I think if they had been allowed to hear all of what DSS knew about all of these children, that would have been more representative of what we settled with Boys Home for because we settled with Boys Home for everything, for anything that happened during that time frame. But what was tried in court in 2019 was just a snapshot. And to the limited purpose that the district court allowed those few boys records in, he did charge the jury that they were only allowed to consider that as to notice and not as to any further, you know, damages on our client. So we think that because of that, the two things are apples and oranges. Boys Home settlement is an apple. The jury verdict is an orange. And because the court found that the damages cannot be reduced to a mathematical equation, which we agree with, we think there should be no set off whatsoever. Happy to answer any other questions. I know I'm about out of time. Thank you very much. Thank you so much. Appreciate your work very much. Appreciate it. We will adjourn court for the day. Come down and greet counsel. It's on to the court adjourned until tomorrow morning. God save the United States and his honorable court.
judges: Robert B. King, Julius N. Richardson, William L. Osteen Jr.